JAMES W. LUCAS AND CARRIE A. PARKS, BY HER NEXT FRIEND, v. JOHN PARKS ET AL.

*Mortgage foreclosure—Redemption—Fraud—Recording laws—Notice —Good-faith purchasers.*

This case involves the alleged fraudulent action of a father in securing the foreclosure of two mortgages upon land the title to which was in his wife at the time of her death, and obtaining the title growing out of such foreclosures, for the purpose of cutting off the rights of his infant daughters in the land as heirs of their mother, and an examination of the entire opinion is essential to an understanding of the decision of the Court.

Appeal from Clinton. (Smith, J.) Argued November 20, 1890. Decided December 24, 1890.

Bill to set aside certain conveyances based upon the title attempted to be procured by a mortgagor through an alleged fraudulent purchase of the mortgaged premises upon foreclosure, and to quiet complainants' title thereto. Complainants appeal. Decree modified and affirmed. The facts are stated in the opinion.

*Vosper Bros.* (*J. C. Blanchard*, of counsel), for complainants, contended:

1. To render a wife liable upon a note signed by her husband, proof

must be made of the facts connecting her with the consideration; citing *Insurance Co. v. McClellan*, 43 Mich. 564; *Reed v. Buys*, 44 Id. 80; *Edwards v. McEnhill*, 51 Id. 160; *Schlatterer v. Nickodemus*, Id. 626; and the note signed by John Parks and his wife, under the proofs in this case, is but *his* note; citing *Russel v. Bank*, 39 Mich. 671.

2. The McBlain mortgage was an incumbrance upon the premises at the time John Parks conveyed them to his wife by warranty deed, and he became legally and equitably liable to pay the mortgage, and any interest subsequently acquired by him would feed his deed, and inure by way of estoppel to the benefit of his grantee and her heirs; citing *Shotwell v. Harrison*, 22 Mich. 410; *Damouth v. Klock*, 29 Id. 289; *Lee v. Clary*, 38 Id. 223; *Smith v. Williams*, 44 Id. 240.

3. But it is not conceded that John Parks acquired any interest in the premises through the foreclosure of the McBlain mortgage. What he did was but a payment and satisfaction of his own debt, or, at most, but a redemption by the mortgagor, and a duty he owed to the heirs of his wife; and any colorable title he might have acquired through such foreclosure would be held in trust for them; citing Jones, Mort. §§ 864, 865; *Wadsworth v. Williams*, 100 Mass. 126; and, as to the Parks mortgage, his wife had, at most, but made her property surety for his debt, and the same rule as to suretyship applies; citing Jones, Mort. § 114.

4. The question of the defendants being good-faith purchasers or incumbrancers has no foundation in this case, for the records fully apprised them that John Parks was but paying his own debts, which he was under moral and contract obligation to pay, and that the deed he received would inure to the benefit of the heirs of his wife, and operate as a discharge of the mortgage; citing *Baker v. Mather*, 25 Mich. 51; Jones, Mort. §§ 864, 867; and the continued possession of the premises by the heirs was notice to all the world of what rights they had therein; citing *Russell v. Sweezey*, 22 Mich. 235.

5. Silence respecting facts already known by the other party, or where facts are equally known by both parties, never constitutes ground for an estoppel; citing 3 Washb. Real Prop. (4th ed.) 74; *Hill v. Epley*, 31 Penn. St. 331; and defendant Langenbacher had not only the means of knowing, but actually knew, more about the facts affecting the title to the land she was loaning money upon than Mrs. Hurlbert, whose silence in no way influenced her action, as she relied exclusively upon her legal adviser and agent, Hammond. Besides, Mrs. Hurlbert was under no obligation to expound to her her opinion of the

force and effect of the foreclosure proceedings, or as to the state of the title; citing *McAuliffe v. Mann*, 37 Mich. 539; nor would such opinion, if expressed, afford ground for an estoppel; citing *Thayer v. Arnold*, 32 Mich. 336.

6. The law does not permit title to land to rest in parol, nor anything evidenced by the deeds to be changed by parol testimony; citing *Hayes v. Livingston*, 34 Mich. 384; nor can oral statements or silence have the effect, in courts of law or equity, to pass a title or create an interest in lands, which the statute expressly declares can only be created by writing; citing *Nims v. Sherman*, 43 Mich. 45; *Shaw v. Chambers*, 48 Id. 355; and, finally, if Mrs. Langenbacher claimed the benefit of an estoppel from proof of what occurred at the farm, she should have so stated in her answer; citing *Dale v. Turner*, 34 Mich. 405; *Smith v. Rumsey*, 33 Id. 189; *Whittemore v. Stephens*, 48 Id. 573; *Kelly v. Kelly*, 54 Id. 30; and no affirmative relief can be awarded a defendant in the absence of a special prayer therefor by an answer under the rule or by a cross-bill; citing *Pattison v. Hull*, 9 Cow. 747; *Vary v. Shea*, 36 Mich. 388; *Vroman v. Thompson*, 51 Id. 452.[1]

7. In answer to the claim of Mrs. Simmons and Mrs. Langenbacher to subrogation, and in support of the proposition that a person cannot, in the absence of contract obligation, or an interest in the subject-matter, requiring the advancement of money to fulfill such contract or protect such interest, of his own motion, or as a mere volunteer, clothe himself with the rights and securities his money may have gone to extinguish, counsel cited Jones, Mort. §§ 869, 874, 877; *Smith v. Austin*, 9 Mich. 465, 474; *Kitchell v. Mudgett*, 37 Id. 81; *Mather v. Jenswold*, 72 Iowa, 550; *Mickles v. Townsend*, 18 N. Y. 575; *Sanford v. McLean*, 3 Paige, 117.[2]

*Fedewa & Lyon*, for defendant Simmons, and *Spaulding & Walbridge*, for defendant Kempf, contended:

1. It cannot be claimed that John Parks redeemed from the foreclosure of the McBlain mortgage, under which the title matured in the mortgagee on January 12, 1879, for, while his deed to Parks is dated and acknowledged prior to that date, it was not delivered until January 13, and no title passed until such delivery; citing *Thatcher v. St. Andrew's Church*, 37 Mich. 264.

2. The deed to Mrs. Parks was a voluntary conveyance, and in effect a quitclaim deed, and any after-acquired title by Parks

---

[1] See *Castle v. Castle*, 78 Mich. 298, 300.

[2] See, as to general doctrine of subrogation, *Bush v. Wadsworth*, 60 Mich. 255 (note).

would not inure to the benefit of Mrs. Parks or her heirs; citing *Wilbur v. Warren,* 104 N. Y. 192; and the testimony shows that it was the intention of the parties that the deed should not take effect if Mr. Parks recovered, which is controlling; citing *Thatcher v. St. Andrew's Church,* 37 Mich. 264.

3. In support of claim to right of subrogation and to compensation for improvements, counsel cited *Lockwood v. Bassett,* 49 Mich. 550; *Kelly v. Kelly,* 54 Id. 48.

*Kilbourne & Humphrey,* for defendant Langenbacher, contended:

1. One who has acquired possession of mortgaged premises, in the belief that he holds title under foreclosure proceedings, is entitled to claim, upon redemption being made under the mortgage, the value of his improvements; citing Jones, Mort. § 1128; *Roberts v. Fleming,* 53 Ill. 196; *Bacon v. Cottrell,* 13 Minn. 194; *Miner v. Beekman,* 50 N. Y. 337.

2. The deed from John Parks to his wife conveyed no title, because it was not intended to unless he died; citing *Pennington v. Pennington,* 75 Mich. 600; *McCullough v. Day,* 45 Id. 554.

3. The foreclosure of the William Parks mortgage cut off all apparent title in Maria Parks to the entire farm, if she had a title under her deed, in which case she was competent to make the mortgage, and her husband's signature was unnecessary; citing *Frickee v. Donner,* 35 Mich. 151; and on its foreclosure he had a right to become the purchaser. Nor is it of consequence that the money secured by the mortgage was for his use, or that it was given to secure his debt; citing *Watson v. Thurber,* 11 Mich. 457.

4. McBlain's quitclaim deed, if delivered January 6, was adequate to convey all the title he had, and all that might accrue under the sheriff's deed, soon to become operative; citing How. Stat. §§ 5653, 5729; *Hoffman v. Harrington,* 28 Mich. 90; *Thayer v. McGee,* 20 Id. 195; but the deed did not become operative until its delivery, January 13, when the title of the grantor under the foreclosure had fully matured. But if the finding is against us on the foreclosures, those claiming under the Simmons deed and Langenbacher mortgage are entitled to be put in the place of the mortgagees, whose mortgages they have furnished money to discharge; citing *Insurance Co. v. Aspinall,* 45 Mich. 330, 48 Id. 238; *Lockwood v. Bassett,* 49 Id. 546; *Warner v. Hall,* 53 Id. 371; *Kelly v. Kelly,* 54 Id. 30.

MORSE, J. This is a controversy involving the title to

about 170 acres of land, situated in the county of Clinton, in this State. The undisputed facts are as follows:

1. On November 30, 1874, the defendant John Parks was the owner in fee-simple of, and with his wife, Maria T. Parks, lived upon, the premises. At this date he was very sick, and not expected to live, and conveyed, in anticipation of his death, the land to his wife by warranty deed, but without any money consideration. At the time of the execution of this deed, there was a mortgage upon the premises running to one Thomas McBlain, in the sum of $500. This mortgage was executed March 1, 1872. After the deed from Parks to his wife, and on October 24, 1876, John Parks executed a mortgage on the same lands to his brother, William Parks, for $238. Maria T. Parks joined with her husband in this mortgage.

2. In 1877, Maria T. Parks died, leaving two minor daughters, Mary Jane, now the wife of Charles S. Hurlbert, and Carrie Parks, as her sole heirs, aged respectively about 10 and 5 years at the date of their mother's death. The legal record title at the time of Mrs. Parks' death stood in her name, subject only to the McBlain and William Parks mortgages. McBlain commenced proceedings to foreclose his mortgage by advertisement before the death of Mrs. Parks, and on January 12, 1878, the premises were sold upon such foreclosure to Thomas McBlain, the mortgagee, and a sheriff's deed executed and delivered to him. On January 9, 1879, McBlain and wife conveyed the lands by quitclaim deed to John Parks. The deed was dated on the 6th, but acknowledged on the 9th, of January. McBlain lived in Geneva, N. Y., and the deed was executed there. After the death of Mrs. Parks, William Parks foreclosed his mortgage, and at a sale had thereunder, May 30, 1878, John Parks became the purchaser at the sum of $330.76.

3. These proceedings put the apparent legal title back into John Parks, and February 3, 1879, he conveyed by warranty deed the west 70 acres of these lands to John P. Simmons. March 28, 1882, Simmons and wife deeded the same to August Watt. Watt paid Simmons $1,850 in cash, and gave a mortgage back to him for the balance of $2,000. Simmons afterwards died, and his widow, the defendant Nancy Simmons, became the owner of this mortgage, which she now holds. The defendant Reuben Kempf also holds a mortgage for $1,200 upon this 70

acres, given by Watt as security for money borrowed of Kempf to pay Simmons on the purchase of the premises. Simmons moved upon the land and made improvements. Watt, upon his purchase, took possession of the land, and has occupied it ever since, and also improved it. These improvements, consisting of buildings, orchard, etc., are valued at from $1,500 to $2,000. This is the history of the 70 acres.

4. The original homestead was upon the remaining 100 acres. John Parks, after his wife's death, remained upon this portion of the premises, and managed and dealt with it as his own, until his second marriage, in 1882, when he móved upon his wife's farm, renting this place to Charles S. Hurlbert, his son-in-law, who paid him rent, and now lives upon it. While Parks lived upon this 100 acres, his children resided with him. Carrie Parks, who was not of age at the time the testimony was taken in this suit, has, since her father moved away, made her home with her brother-in-law, Hurlbert.

5. While Parks was in the occupancy of this 100 acres he gave several mortgages, as follows: John Parks to Thomas McBlain, November 11, 1880, $1,100; John Parks and wife to Samuel E. Hart, November 15, 1883, $1,600; John Parks and wife to A. J. Baldwin, November 19, 1883, $100. To discharge these mortgages, and obtain a lower rate of interest, John Parks borrowed of the defendant Barbara Langenbacher the sum of $3,200, and he and his wife, November 7, 1885, gave her a mortgage to secure that sum upon the land, the 100 acres, which she now holds. With the money obtained from Mrs. Langenbacher, he paid up the three mortgages above noted, and they were discharged of record.

6. February 1, 1886, Mary Jane Hurlbert, formerly Mary Jane Parks, executed a quitclaim deed of all her right, title, and interest in the whole 170 acres, being an undivided one-half interest in the same, as heir at law of her mother, Maria T. Parks, to the complainant James W. Lucas.

In August, 1886, this bill was filed by Lucas and Carrie Parks, by her next friend, praying that the title to the whole premises be decreed to be in them, and that the mortgages held by the defendants Nancy Simmons, Reuben Kempf, and Barbara Langenbacher be delivered up·

and canceled. The bill alleges in support of this prayer that John Parks obtained the title to these premises after his wife's death by fraud; that an agreement was made between him and McBlain, with the knowledge and assent of Simmons, who was about to purchase the 70 acres, that instead of the payment of the mortgage by Parks, and its cancellation and discharge, McBlain should bid the premises off in his own name at the foreclosure sale, and, after his title had ripened, deed the same to Parks, thus cutting off the infant children, and defrauding them, and putting the title in Parks; that Parks bid in his own mortgage to William Parks, having it foreclosed, and a deed made to him, in the furtherance of the same fraud. The bill also charges a knowledge of this fraud upon all the defendants before they acquired any interest in said premises. The defendants Parks and Watt made no defense, and were defaulted. The others answered, denying any knowledge of the alleged fraud, and setting up their equities in the premises.

The evidence was taken in open court before the Honorable Vernon H. Smith, then judge of the Clinton circuit court, who dismissed the bill of complainants upon two grounds:

1. That it was not the intent of John Parks, at the time he made the deed to his wife, to convey the absolute title to her at once, but that it was delivered upon the condition that if he recovered it should not be valid, or of any effect,—if he died it was to be valid, if he lived it was to have no effect; and that Mrs. Parks received it under this understanding.

2. That the equities of the defendants are such that the complainant James W. Lucas, who bought the title upon speculation, is estopped by his own knowledge, and that of his grantor, Mary J. Hurlbert, and her acts, from disputing the mortgages; and that August Watt was a good-faith purchaser of the 70 acres, without any knowledge of any fraud in the obtaining of the title by Parks.

We are satisfied that the bill ought to be dismissed

without any doubt against all the defendants except John
Parks upon the equities of the case.    We are not con-
vinced that Mr. Simmons had knowledge of any fraud
being committed upon the children when he purchased
the 70 acres.    Simmons is dead, and cannot speak for
himself; but his wife testifies that she had no knowledge
of any fraud.    The fact that Simmons knew anything ·
about a scheme between McBlain and John Parks to
defraud his children depends entirely upon the testimony
of John Parks, who appears to be the only witness
presented to establish his own fraud.    He swears that he·
was counseled by the Perrins and Baldwin, attorneys at
St. Johns, that this was the course to take to get the
title back into his hands, and that Simmons was present
when this advice, upon which Parks claims he acted, was
given.  ` Both the Perrins and Mr. Baldwin emphatically
deny that they ever gave him any such advice.    We do
not feel obliged to believe Mr. Parks under these circum-
stances, and we must find that Watt, and Nancy Simmons,
who holds the mortgage given to her husband, are good-
faith purchasers.    This ends the controversy as to the 70
acres, and the bill must be dismissed as against them and
the defendant Reuben Kempf, as there is no pretense
that he had any notice of the alleged fraud, except such
as the record gave him.    We do not think the record of
the title, as it appeared in the office of the register of
deeds, was notice to any one that any fraud had been
committed.

In relation to the 100 acres, it is conclusively shown
that the money advanced by Mrs. Langenbacher was all
used, except, perhaps, a few dollars, in payment of exist-
ing and valid incumbrances upon it,—mortgages put upon
the premises by John Parks, while the legal title stood
in him,—and with no proof that any of them were fraudu-

84 MICH—14.

lent as against these heirs, or taken with any notice of their equities. Mrs. Langenbacher would have the right as against the complainants to be subrogated to the rights of these mortgagees, her money being used in their discharge. Nor did she have any notice of the claims of these heirs. She went up and looked at the premises before she loaned her money, and saw Mrs. Hurlbert there. Mrs. Hurlbert knew what she was there for, and also knew her own rights as well then as she does now, and yet she did not even hint to Mrs. Langenbacher that her father had no right to mortgage the premises. And Hurlbert, her husband, testifies that he knew his wife's rights in the premises, and knew that Mrs. Langenbacher was about to loan this money to John Parks for the express purpose of removing the existing mortgages; that, while the negotiations were going on between Mrs. Langenbacher and Parks for this loan, he went to the office of Hammond, at North Lansing, who was her attorney, and obtained the abstract of title of the land, which Parks had given to the son of Mrs. Langenbacher, that he and Lucas might take the same to Mr. Blanchard, at Ionia, to get his advice as to his wife's rights in the land; and that he did not acquaint Hammond, or the Langenbachers, with the fact that his wife claimed title to the land, or that there was any defect in Parks' title, because he was not "open hearted" or "green enough for that;" and that he did not want Mrs. Langenbacher to know about the claim of the heirs until she had loaned the money, and taken up the mortgages then on the place, as they were about to be foreclosed, and he was financially embarrassed, and would thereby get further time in which to raise the point of his wife's title to the premises.

" Q. Mrs. Langenbacher's money gave you a breathing spell until you could find this fellow [Lucas] to sell it

to, and then let them fight it out and let your wife out?

"*A.* Yes, sir.

"*Q.* Your idea was to take your wife out from under this yoke, and let this fellow fight it out, was it not?

"*A.* You bet it was."

It is also apparent from the testimony that Mrs. Hurlbert and Lucas were both cognizant of and parties to this scheme to let Mrs. Langenbacher take up by her money these mortgages then past due, and being pressed for payment, and take her mortgage on long time, so that they could be given leisure in which to assert Mrs. Hurlbert's claim to the premises, or one-half of them.     Lucas admits that he bought a chance, and was to run all risks and expenses of the lawsuits necessary to maintain the title of the heirs.     He claims that the bargain was to pay each of them $2,500.     He paid Mrs. Hurlbert $800 down, and gave her security for the balance.     With Carrie Parks he had to trust to her ratifying the purchase when she became of age, and therefore paid her nothing.     We think they have no equities as against Mrs. Langenbacher.

But as against John Parks, it is different.     He has admitted the fraud upon his children, as alleged in the bill, both by his default and his testimony under oath. I am disposed to let him lie in the bed he has made. There is sufficient testimony in the case to sustain the finding or opinion of the circuit judge that this deed was never intended to take effect unless John Parks died of his then illness.     But he did not move before his wife's death to have the title restored to him, and he himself positively denies in his testimony that the deed was any other than one intended to take effect at once, and to vest the title absolutely in his wife.     And I am thoroughly satisfied that there would never have been any litigation or trouble in this case had it not been for this same

John Parks. Satisfied, as he now seems to be, that the equitable title to these premises is in the heirs of his wife, he could have deeded the 100 acres to his daughters, as, under such circumstances, it was his duty to have done. But there was an evident desire upon his part to divest innocent purchasers of their titles and securities for which they had paid value, and held for a long time by his active consent; or, at least, he was willing to assist Lucas and his son-in-law in their attempt to defraud such persons as had invested money upon the strength of his title, and at his request, when, if he is to be believed, he knew his title was fraudulent when he sold or mortgaged the premises to them. He is, more than any other person, responsible for the state of things as we find them, and for this litigation. It is equitable that he should in this case reap what he has sown. As against him I think the heirs should prevail.

It is contended very strenuously that the record title, as it stood, was notice to purchasers of the wife's title, and that, therefore, no one could be a good-faith purchaser, as the heirs of the wife were continuously in the possession of the premises; that the record of the mortgage foreclosures, upon which John Parks based his title, showed that the result of those proceedings was but a payment of John Parks' own debts, and that as in equity Parks could not acquire title to the land by purposely or otherwise making default in the payment of his own debts, and bidding the land in as his own, and as the law would consider it a payment of his own debts and a cancellation of the mortgages, the purchaser, after examining the title, and finding it in this condition, was bound to look further, and inquire into the rights of the heirs of the wife. This might be true, so far as the McBlain mortgage was concerned, which was security for the note of John Parks alone, and which it may be

inferred was signed only by the wife to convey her dower interest. But the mortgage given to William Parks was executed when the title was in the name of the wife, and it was given to secure a note signed by John Parks and Maria T. Parks jointly. And it would, under the circumstances, be presumable from the record that it was her debt instead of his. If so he had as much right to bid in the premises as any one. And, under these circumstances of the record, as said before, we do not think the records were notice to any one that the title was not in John Parks. The possession of the heirs of the wife was always the possession of John Parks. They never occupied the premises, except as they lived as children with their father, until he moved away, and then Hurlbert, who occupied, rented of him. All the conveyances, except the mortgage to Mrs. Langenbacher, were made while Parks occupied the premises, and claimed title. And what Hurlbert and his wife did in the case of Mrs. Langenbacher has been already stated.

My conclusion is that the bill was properly dismissed, and the decree must be affirmed as against all the defendants except John Parks, with costs of both courts. As to the 100 acres, the decree will be modified so that the title to the same will be decreed in the complainants, subject to the payment of the mortgage to Mrs. Langenbacher, which is hereby declared to be a valid lien upon such premises.

The other Justices concurred.